**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 14, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

STEVEN HOWARDS,

    Plaintiff-Appellee,

v.

DANIEL McLAUGHLIN, in his individual and official capacity; ADAM DANIELS, in his individual and official capacity,

    Defendants-Appellants,

VIRGIL D. "GUS" REICHLE, JR., in his individual and official capacity; DAN DOYLE, in his individual and official capacity,

    Defendants.

------------------------------

UNITED STATES OF AMERICA,

    Amicus Cuiae.

No. 09-1201

---

STEVEN HOWARDS,

    Plaintiff-Appellee,

v.

VIRGIL D. "GUS" REICHLE, JR., in his individual and official capacity; DAN DOYLE, in

No. 09-1202

his individual and official capacity.

Defendants-Appellants,

DANIEL McLAUGHLIN, in his individual and official capacity; ADAM DANIELS, in his individual and official capacity,

Defendants.
----------------------------

UNITED STATES OF AMERICA,

Amicus Cuiae.

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:06-CV-01964-CMA-CBS)**

Sean R. Gallagher (Dugan Bliss with him on the briefs) of Hogan & Hartson LLP, Denver, Colorado, for Defendants Reichle and Doyle.

Richard Westfall (Aaron Solomon with him on the briefs) of Hale Friesen, LLP, Denver, Colorado, for Defendants Daniels and McLaughlin.

David A. Lane (Althea S. Licht with him on the brief), of Killmer, Lane & Newman, LLP, Denver, Colorado, for Plaintiff.

Tony West, Assistant Attorney General, Washington, D.C.; David M. Gaouette, Acting United States Attorney, District of Colorado, Denver, Colorado; and Barbara L. Herwig and Teal Luthy Miller, Attorneys, Appellate Staff, Civil Division, Washington, D.C., filed a brief for Amicus Curiae.

Before **KELLY**, **SEYMOUR**, and **LUCERO**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Steven Howards brought the present action alleging, *inter alia*, that defendants Secret Service Agents unlawfully arrested him in violation of his First and Fourth Amendment rights. Defendants moved for summary judgment on the basis that they were immune from suit. Following a hearing on the merits, the district court concluded fact issues precluded the grant of qualified immunity as well as summary judgment. The case is now before us on defendants' interlocutory appeal from the district court's denial of their motion for qualified immunity. For the reasons below, we REVERSE in part and AFFIRM in part.

**I.**

The present dispute arises out of a series of events occurring at the Beaver Creek Mall, an outdoor shopping center in Beaver Creek, Colorado.[1] On June 16, 2006, Mr. Howards accompanied his older son to a piano recital at the Beaver Creek Mall. That same day, Vice President Cheney also visited the Mall, along with his security detail, which included defendants Secret Service Protective Intelligence Coordinator Gus Reichle, and Secret Service Special Agents Dan Doyle, Adam Daniels, and Daniel McLaughlin (collectively the "Agents"). As the Protective Intelligence Coordinator, Agent Reichle's duties included

---

[1] For purposes of this appeal, we consider the facts in a light most favorable to Mr. Howards. *See, e.g.*, *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1256 n.1 (10th Cir. 1998).

interviewing individuals who were suspected of violating the law. Agents Daniels and McLaughlin were partnered together in the Counter Surveillance Unit, Vice Presidential Protective Division. They were in an undercover role that day, and they did not carry radios.

While en route to the recital hall, Mr. Howards made a call on his cellular phone. During this call, he observed the Vice President exit a grocery store and begin to speak with members of the public. Upon seeing the Vice President, Mr. Howards stated into his cell phone, "I'm going to ask him [the Vice President] how many kids he's killed today." Aplt. App. at 532.

Agent Doyle overheard Mr. Howards' cell phone conversation. He assumed that Mr. Howards was referring to the war in Iraq, and he considered it "[un]healthy" and "[not] quite right" for a person to make such a statement to the Vice President. *Id.* He has admitted the comment "disturbed" him. *Id.* He informed Agent McLaughlin about Mr. Howards' statement, advising him that they "should pay particular attention to a white male subject [Mr. Howards] wearing a green T-shirt . . . [because] he [had] overheard the subject state while speaking on the phone 'something to the effect of "I want to ask Cheney how many kids he had killed."'" *Id*. at 508. Agent McLaughlin replied, "Okay," because he believed it was "within [Mr. Howards'] bounds to do that." *Id.* at 425. Agent McLaughlin in turn relayed the information to Agent Daniels and informed him that "we need to keep an eye on . . . Mr. Howards." *Id*. at 413. All three

-4-

agents began to monitor Mr. Howards.

Mr. Howards' son continued on to the recital; Mr. Howards remained behind to visit with the Vice President. As Mr. Howards waited for his turn, he observed the Vice President interacting with the gathering crowd, greeting patrons, shaking hands, and posing for photographs with onlookers. He then approached the Vice President and informed him that his "policies in Iraq are disgusting." *Id*. at 491. The Vice President responded, "Thank you." *Id*. As he departed, Mr. Howards touched the Vice President's right shoulder with his open hand.[2] Although Agents Daniels, McLaughlin, and Doyle continued to monitor Mr. Howards and witnessed the touch, none of them were close enough to hear Mr. Howards' statements to the Vice President. Neither Agent Daniels nor Agent McLaughlin believed Mr. Howards' touch of the Vice President provided probable cause for arrest. *See id.* at 418, 428.

Special Agent Mike Lee, who was standing near the Vice President and in charge of the protective detail, overheard the verbal exchange. As Mr. Howards

---

[2] The manner in which Mr. Howards touched the Vice President is disputed by the parties. Mr. Howards described the touch as an open-handed pat on the shoulder. Others, however, including the Agents, have described the touch as "push[ing] off" the Vice President's shoulder, Aplt. App. at 390, "a get-your-attention-type touch," *id.* at 395, a "slap," *id.* at 418, "a forceful touch," *id.* at 432, and a strike that caused "the Vice President's shoulder [to] dip[]," *id.* at 435. Because our review requires us to consider the evidence in the light most favorable to Mr. Howards, *see, e.g.*, *Armijo*, 159 F.3d at 1256 n.1, we will assume, without deciding, that his characterization is accurate.

walked away, Special Agent Andrew Wurst, who was approximately fifteen yards from the Vice President when the touch occurred, approached Agent Lee. Agents Lee and Wurst agreed that a protective intelligence team should be sent to speak with Mr. Howards. Agent Wurst then asked Special Agent Oscar Rosales to send the protective intelligence team to speak with Mr. Howards. After Agents Wurst and Rosales separated, Agent McLaughlin approached Agent Rosales to inquire whether a protective intelligence team was going to interview Mr. Howards.

Thereafter, Agent Gus Reichle, the intelligence coordinator, was dispatched to interview Mr. Howards as a person of interest in "an incident involving Vice President Cheney." *Id.* at 369. Although Agent Reichle had neither overheard the cell phone statement nor observed the actual interaction between Mr. Howards and the Vice President, Agent Doyle debriefed him as he approached Mr. Howards. Agent Doyle identified Mr. Howards as the person of interest and provided "a quick thumbnail sketch that he had overheard the subject on a cellular telephone whom [sic] stated, 'I'm going to ask him how many kids he's killed today.'" *Id*. at 371. Agent Reichle assumed that Mr. Howards' reference was to Vice President Cheney. *Id*.

Mr. Howards then left the vicinity and proceeded to join his family at the recital hall. Upon his arrival, Mr. Howards' wife asked him to accompany his younger son back to their condo. Mr. Howards and his son left the recital hall and began to walk towards the mall exit. On their way out, Mr. Howards and his

-6-

son again entered the area where the Vice President was conducting his meet and greet. Before they reached the mall exit, his son wandered off, and Mr. Howards began to look for him.

During the search for his son, Mr. Howards was approached by Agent Reichle, who was dressed in civilian clothes. Special Agents Daniels, Doyle, and McLaughlin remained nearby in a counter-surveillance role. Agent Reichle presented his Secret Service badge, identified himself, and requested to speak with Mr. Howards. Mr. Howards refused to speak with the agent and attempted to resume the search for his son. Agent Reichle stepped in front of Mr. Howards to prevent his departure and asked Mr. Howards if he had assaulted the Vice President. Mr. Howards pointed his finger at Agent Reichle, denied assaulting the Vice President, and informed the agent that "if you don't want other people sharing their opinions, you should have him [the Vice President] avoid public places." *Id*. at 494. Agent Reichle became "visibly angry" when Mr. Howards shared his opinion on the Iraq war. Mr. Howards again attempted to resume his search for his son.

In his deposition, Mr. Howards articulated the events that followed:

A. At some point [Agent Reichle] said to me – I believe there actually – he also asked me if I touched the Vice President.
Q. How did you respond to that?
A. I believe I said I hadn't.
Q. Okay. And that wasn't truthful, was it?
A. That wasn't accurate.
Q. Do you recall him asking you any additional questions?

A.    No.  That's what I recall.

*Id.* at 495.  Agent Reichle asked the nearby agents whether anyone had witnessed the physical encounter between Mr. Howards and the Vice President.  Agent Doyle stepped forward and confirmed that he had witnessed the physical contact, and he performed a demonstration of the touch.  Agents Daniels and McLaughlin confirmed that Agent Doyle's demonstration was an accurate recreation of the exchange.[3]

Based upon Mr. Howards' "premeditation, the conversation on the cell phone, the fact that Mr. Howards would not talk to [him], the fact that he's walking around with a bag in his hand in an unmagged [no metal detector] area, and the fact that [Doyle told him] that he had unsolicited contact," *id.* at 280, Agent Reichle decided to arrest Mr. Howards for assault on the Vice President.  Agents Doyle, Daniels, and McLaughlin assisted in restraining Mr. Howards during the arrest.

Mr. Howards was turned over to the Eagle County Sheriffs Department and detained for several hours.  Ultimately he was charged with harassment in violation of Colorado state law.  The state prosecutor subsequently dismissed the charges, however, and no federal charges were ever filed.

---

[3] Just as the parties dispute the nature of Mr. Howards' touch, there is disagreement as to whether Agent Doyle's recreation of the touch was accurate. This dispute is not relevant to our disposition of the appeal.

Mr. Howards brought the present action pursuant to 42 U.S.C. § 1983 or, alternatively, under *Bivens v. Six Unknown Drug Agents*, 403 U.S. 388 (1971), against Agents Reichle, Doyle, Daniels, and McLaughlin in both their official and individual capacities.[4] He alleges that the Agents violated his Fourth Amendment rights by an unlawful search and seizure, and his First Amendment rights by retaliating against him for engaging in constitutionally protected speech. At the close of discovery, all four defendants moved for summary judgment, arguing that qualified immunity shielded them from the present suit. Following a hearing on the merits, the district court determined that fact issues as to the availability of the qualified immunity defense precluded judgment as a matter of law to defendants. This interlocutory appeal followed.

## II.

Our jurisdiction over the present appeal is governed by 28 U.S.C. § 1291, which provides general jurisdiction over appeals from final decisions of lower courts. Since *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949), the Supreme Court has construed § 1291's jurisdictional grant to extend to a class of

---

[4] Although Mr. Howards initially named only Gus Reichle as defendant, he subsequently amended his complaint to add defendants Secret Service Agents Kristopher Mischloney, Daniel McLaughlin, Dan Doyle, and Adam Daniels, in both their individual and official capacities. *See* 2d Am. Compl. at 1. The court later granted the parties' joint motion to dismiss defendant Mischloney. *See* Order of June 5, 2008, at 1.

collateral rulings that may be appealable as "final decisions," notwithstanding the absence of a final decision terminating litigation. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

To be eligible for interlocutory appeal under *Mitchell*'s collateral order doctrine, the decision must be conclusive on the question it decides, must resolve important questions separate from the merits, and must be effectively unreviewable if not addressed through an interlocutory appeal. *Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 605 (2009). "Because a plea of qualified immunity can spare an official not only from liability but from trial, . . . [w]hen summary judgment is denied to a defendant who urges that qualified immunity shelters her from suit, the court's order 'finally and conclusively [disposes of] the defendant's claim of right not to stand trial.'" *Ortiz v. Jordan*, 131 S. Ct. 884, 891 (2011) (quoting *Mitchell*, 472 U.S. at 527) (alteration in original). As a result, a district court's denial of a qualified immunity claim is eligible for appeal under the collateral order doctrine insofar as it turns on an issue of law. *Mitchell*, 472 U.S. at 530; *see also Behrens v. Pelletier*, 516 U.S. 299, 313 (1996) ("[S]ummary judgment determinations *are* appealable when they resolve a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity–typically, the issue whether the federal right allegedly infringed was 'clearly established.'" (second alteration in original) (citations omitted)). We may not review a denial of summary judgment, however, which "determines only a question of 'evidence

sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial."
*Johnson v. Jones*, 515 U.S. 304, 313 (1995).

In this case, the district court found disputes of material facts as to the defendants' entitlement to qualified immunity and, accordingly, denied their motions for summary judgment. On appeal, Mr. Howards contends we lack jurisdiction to consider the appeal because "appellate review of the District Court's denial of qualified immunity would necessarily involve questioning the District Court's determinations of evidence sufficiency and genuine disputed material facts . . . ." Aple. Br. at 12. On the other hand, the Agents and the United States, as amicus, argue this appeal turns on pure questions of law that may be properly brought on interlocutory appeal.

We conclude we have jurisdiction to review this appeal, but only to the extent that the "defendant[s'] appeal of the denial of a motion for summary judgment is based on the argument that, even under the plaintiff's version of the facts, the defendant[s] did not violate clearly established law." *Johnson v. Martin*, 195 F.3d 1208, 1214 (10th Cir. 1999). Although as a general matter we review the district court's denial of summary judgment de novo, *see Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009), our review in the qualified immunity context deviates from the standard applicable to other summary judgment decisions. *Id.* In considering the legal issues,

[W]e review whether, under [the plaintiff's] version of the facts,

-11-

[defendants] violated clearly established law.  In making this determination, we must scrupulously avoid second-guessing the district court's determinations regarding whether [plaintiff] has presented evidence sufficient to survive summary judgment.  Rather, we review only whether [defendants'] conduct, as alleged by [plaintiff], violated clearly established law.

*Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997).

### III.

The district court held that Mr. Howards stated a claim under 42 U.S.C. § 1983.[5]  Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights.  *Id.* Although § 1983 "create[d] a species of tort liability that on its face admits of no immunities," *Imbler  v. Pachtman*, 424 U.S. 409, 417 (1976), the Supreme Court "has recognized that government officials are entitled to some form of immunity from suits for civil damages." *Nixon v. Fitzgerald*, 457 U.S. 731, 744 (1982). "State government officials performing discretionary functions enjoy qualified immunity from liability under 42 U.S.C. § 1983." *Clanton*, 129 F.3d at 1153. "Such immunity is qualified in that it does not obtain when otherwise immune officials violate clearly established statutory or constitutional rights of which a

---

[5] Given our jurisdictional restraints, *see, e.g.*, *Fogarty*, 523 F.3d at 1154; *Armijo*, 159 F.3d at 1259, we decline to review the district court's determination that Mr. Howards raised an issue of material fact as to whether the Agents participated in joint activity with state officials sufficient to render Mr. Howards' claim eligible for § 1983 relief.

-12-

reasonable person would have known." *Armijo*, 159 F.3d at 1620 (quoting

*Clanton*, 129 F.3d at 1153) (internal quotation marks omitted).

In this case, the Agents claim the doctrine of qualified immunity shields

them from liability for the discretionary functions they performed "under color"

of state law. *See Clanton*, 129 F.3d at 1153. "To act 'under color' of state law

does not require that the accused be an officer of the State. It is enough that he is

a willful participant in joint activity with the State or its agents." *United States v.*

*Price*, 383 U.S. 787, 794 (1966).[6]

As we have noted, Mr. Howards claimed he was entitled alternatively to

bring this action under *Bivens*. Because the "constitutional injuries made

actionable by § 1983 are of no greater magnitude than those for which federal

---

[6] The Agents also contend they are entitled to absolute immunity from Mr. Howards' claims. Although "some officials perform 'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability," the Supreme Court has been "'quite sparing' in recognizing absolute immunity for state actors in this context." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993) (citations omitted). For executive officials generally, "qualified immunity represents the norm." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1983). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley*, 509 U.S. at 269 (alteration in original) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)) (internal quotation marks omitted). The Agents have failed to demonstrate a common law tradition, a Congressional purpose, or a decision from the Supreme Court or our circuit affording absolute immunity to law enforcement officers protecting executive officials, and we decline to extend such immunity here. *Cf. Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991) (per curiam) (granting qualified immunity to Secret Service Agents sued for violating the Fourth Amendment).

officials may be responsible," federal officials are accorded the same immunity for suits brought under *Bivens* as that which "is accorded state officials when sued for the identical violation under § 1983." *Butz v. Economou*, 438 U.S. 478, 500 (1978). The Supreme Court has explained that "it would be 'untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 818 n.30 (1983) (quoting *Butz*, 438 U.S. at 504); *see also Hartman v. Moore*, 547 U.S. 250, 255 n.2 (2006) ("Though more limited in some respects not relevant here, a *Bivens* action is the federal analog to suits brought against state officials under [§ 1983]."). As a result, it is irrelevant for our qualified immunity analysis whether Mr. Howards' suit proceeds under *Bivens* or § 1983.

In qualified immunity cases at the summary judgment stage, the "plaintiff must demonstrate on the facts alleged (1) that the defendant[s] violated his constitutional or statutory rights, and (2) that the constitutional right was clearly established at the time of the alleged unlawful activity." *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1199 (10th Cir. 2009) (citing *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009)). We have "the discretion to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.* (quoting *Pearson*, 129 S. Ct. at 817-18).

-14-

"In showing that the law was clearly established, the plaintiff does not have to show that the specific action at issue had been held unlawful, but the alleged unlawfulness of the defendant's conduct must be apparent in light of preexisting law." *Armijo*, 159 F.3d at 1260. In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Clanton*, 129 F.3d at 1154) (internal quotation marks omitted). A plaintiff may meet his or her burden by pointing to "a Supreme Court or Tenth Circuit opinion on point, or [by showing] that his or her proposition is supported by the weight of authority from other courts. However, we do not require plaintiffs to produce a factually identical case, but allow some degree of generality in factual correspondence." *Id.* (citation omitted).

### A.   Fourth Amendment Claim

The Agents urge us to reverse the district court's order denying them immunity from Mr. Howards' Fourth Amendment retaliatory arrest claim. They argue that even under Mr. Howards' version of the facts, they possessed probable cause to believe he had violated 18 U.S.C. § 1001 by lying to them. Section 1001 prohibits the knowing and willful making of "any materially false, fictitious, or fraudulent statement or representation." A violation of § 1001 occurs where "(1) the defendant made a statement; (2) that was false and the defendant knew it was false; (3) the statement was made knowingly and willfully; (4) the statement was

-15-

made within the jurisdiction of a federal department or agency; and (5) the statement was material." *United States v. Finn*, 375 F.3d 1033, 1037 (10th Cir. 2004) (citing *United States v. Kingston*, 971 F.2d 481, 486 (10th Cir. 1992)).

"When a warrantless arrest is the subject of a § 1983 action, the arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to make the arrest." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007). Whether the Agents had probable cause to arrest Mr. Howard is a legal question we review de novo, asking whether the "facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) (quoting *Jones v. City & Cnty. of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988)) (internal quotation marks omitted). "Our determination on this score is an independent and objective one. Thus an officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime." *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008).

Reviewing the facts through Mr. Howards' lens, there was probable cause to arrest him for a suspected violation of § 1001.[7] The Agents testified, and Mr.

---

[7] In district court, the Agents proffered additional offenses for which they
(continued...)

-16-

Howards does not dispute, that Agent Reichle was directed to interview a protective intelligence subject, Mr. Howards. Agent Reichle received information from three different Secret Service Agents that Mr. Howards had made unsolicited physical contact with the Vice President. During the course of Agent Reichle's investigation into the nature and circumstances of that physical contact, he attempted to interview Mr. Howards, who was not cooperative. As Mr. Howards conceded in his deposition, he made factually inaccurate statements during his exchange with Agent Reichle. Specifically:

> A.  At some point . . . [Agent Recihle] also asked me if I touched the Vice President.
> Q.  How did you respond to that?
> A.  I believe I said I hadn't.
> Q.  Okay. And that wasn't truthful, was it?
> A.  That wasn't accurate.

Aplt. App. at 495. Given this progression of events, there is no doubt that Agent Reichle possessed probable cause to arrest Mr. Howards for lying to a federal agent in violation of 18 U.S.C. § 1001.

Mr. Howards attempts to impeach his own deposition by arguing his "own testimony . . . indisputably casts doubt on whether Mr. Howards even made the [false] statement." Aple. Br. at 28. No part of the record supports this reading of

---

[7](...continued) claimed probable cause to arrest Mr. Howards. Because we hold the Agents had probable cause to arrest Mr. Howards for violating 18 U.S.C. § 1001, we need not consider whether probable cause existed for any other offenses.

-17-

his testimony, however. During the deposition, Mr. Howards explained this conversation with Agent Reichle further:

> Q. You testified earlier that you denied putting your hands on Mr. Cheney at some point when Agent Reichle made inquiry of you, and you indicated that was inaccurate. Why did you deny to Agent Reichle that you had put your hands on the Vice President?
>
> A. Because it was so nonchalant and unconscious that it just didn't register at the time.

Aplt. App. at 498. Later in the deposition, Mr. Howards described the conversation again: "He asked me first . . . Did you assault the Vice President? That's the question I remember. . . . At which point I said, No. And then he asked me another question, which may have been, Did you touch the Vice President?" *Id.* at 499-500. If Mr. Howards had misspoken, he had ample opportunity to explain this during the deposition. He did not.

Mr. Howards tries to bolster his Fourth Amendment claim by suggesting that the 18 U.S.C. § 1001 violation was an "after-the-fact justification." This argument is misguided. Under the Fourth Amendment, the "constitutionality of an arrest does not depend on the arresting officer's state of mind." *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006). The "'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.' An arrest is not invalid under the Fourth Amendment simply because the police officer subjectively intended to base the arrest on an offense for which probable cause is lacking, so long as 'the

circumstances, viewed objectively, justify' the arrest." *Id.* (citations omitted) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)); *cf. United States v. Santana-Garcia*, 264 F.3d 1188, 1192 (10th Cir. 2001) ("That an officer did not believe probable cause existed to detain a suspect does not preclude the Government from justifying the suspect's detention by establishing probable cause.").

The constitutionality of Mr. Howards' arrest is not undermined simply because the justification used to support the lawfulness of the arrest was not in the Agents' mind at the time the arrest was made. Despite Mr. Howards' contention, probable cause in this case is not established by an after-acquired fact. At the time of the arrest, Mr. Howards had already claimed, falsely, that he did not touch the Vice President. The facts, as they were known to the Agents at the time, objectively justified the arrest under § 1001. This remains true despite the fact that, at the time of the arrest, Agent Reichle intended to base the arrest on other charges.

"[W]hen an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of public and private interests is not in doubt. The arrest is constitutionally reasonable." *Virginia v. Moore*, 553 U.S. 164, 171 (2008); *see also Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth

-19-

Amendment, arrest the offender."). Similarly, because the arrest was supported by probable cause, the search of Mr. Howards incidental to the arrest was also lawful. *See, e.g.*, *Beck v. Ohio*, 379 U.S. 89, 90 (1964) ("There are limits to the permissible scope of a warrantless search incident to a lawful arrest, but . . . if the arrest itself was lawful, those limits were not exceeded here."); *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) ("[O]fficers may conduct a warrantless search of a person when it is incident to a lawful arrest of that person.").

Because the arrest and search were not in violation of the Fourth Amendment, Mr. Howards is unable to satisfy the first prong of our qualified immunity analysis. *See Pearson*, 129 S. Ct. at 815-16; *Swanson*, 577 F.3d at 1199. The presence of probable cause for Mr. Howards' arrest entitles the Agents to qualified immunity from the Fourth Amendment claims against them. Accordingly, we reverse the district court's denial of the Agents' assertions of qualified immunity on this claim.

### B.  First Amendment Claim

Even if an official's action would be "unexceptionable if taken on other grounds," when retaliation against Constitutionally-protected speech is the but-for cause of that action, this retaliation is actionable and "subject to recovery." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998); *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-

84 (1977)); *see also DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." (internal quotation marks omitted)); *cf. Whren v. United States*, 517 U.S. 806, 813 (1996) (explaining that although the constitutionality of a seizure under the Fourth Amendment does not depend on the motivations of the officers involved, "selective enforcement of the law based on considerations such as race" violates the Equal Protection Clause). "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman*, 547 U.S. at 256 (quoting *Crawford-El*, 523 U.S. at 588 n.10) (alteration in original). Moreover, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Id.*; *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (noting government may not punish a person or deprive him of a benefit due to his "constitutionally protected speech").

"To establish a First Amendment retaliation claim, a plaintiff must show that (1) he was engaged in constitutionally protected activity, (2) the government's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the government's actions were substantially motivated as a response to his constitutionally

-21-

protected conduct." *Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)). The district court denied qualified immunity from Mr. Howards' First Amendment claim on the basis that "numerous issue [sic] of material fact exist that must be determined by a jury." Dist. Ct. Order at 76, Aplt. App. at 716 (hereinafter "Order").

The district court expressed its belief that its decision was "based on the facts," and thus "there is [no] basis for an interlocutory appeal." *Id.* at 77. However, it did not "identify the particular charged conduct that it deemed adequately supported by the evidence." *See Armijo*, 159 F.3d at 1259 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)) (internal quotation marks omitted). Given the different roles of each agent in Mr. Howards' arrest, we will first address the arguments of Agents Reichle and Doyle as to why they are entitled to qualified immunity on the First Amendment claim, and then turn to those of Agents Daniels and McLaughlin.

*1. Agents Reichle and Doyle*

We agree with the district court that Mr. Howards has presented evidence sufficient to deprive Agents Reichle and Doyle of qualified immunity on the First Amendment claim at this stage. Although we reach this conclusion using a different analytical path than the district court, "we may affirm on any grounds that are sufficiently supported by the record to allow for a conclusion as a matter

-22-

of law." *Nielander*, 582 F.3d at 1166.

      a. Mr. Howards has sufficiently articulated a First Amendment violation.

Mr. Howards argues, and Agents Reichle and Doyle do not contest, that Mr. Howards has satisfied the three elements of a First Amendment violation articulated in *Nielander*. Indeed, because their briefs on this issue focus solely on their probable cause argument which we discuss below, they do not address the *Nielander* factors at all.

Viewing the record in the light most favorable to Mr. Howards, we agree that he has satisfied the elements of a First Amendment retaliation claim. First, his speech leading up to his arrest fell within the "broad command" of the First Amendment.[8] *See, e.g.*, *Spence v. Washington*, 418 U.S. 405, 410 (1974) (recognizing that "pointed expression[s] of anguish . . . about the then-current domestic and foreign affairs of [the] government" are protected by the First Amendment). Second, there can be no question that an arrest in retaliation for the exercise of protected speech constitutes an injury cognizable under our First

---

[8] Although Mr. Howards' brief focuses on his statement that he was "going to ask [the Vice President] how many kids he's killed today," *see* Aple. Br. at 45-46, he makes passing reference to other statements that conceivably motivated his arrest. Specifically, Mr. Howards declined Agent Reichle's initial invitation to speak out about his encounter with the Vice President. *Id.* at 7. Thereafter, he did explain the encounter with the Vice President and informed Agent Reichle that if "you [Agent Reichle] don't want other people sharing their opinions, you should have him avoid public places." *Id.*

Amendment jurisprudence. *See Worrell*, 219 F.3d at 1212 ("[A]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." (internal quotation marks omitted)).

Third, Mr. Howards has provided facts which suggest Agents Doyle and Reichle may have been substantially motivated by Mr. Howards' speech when he was arrested. Agent Doyle overheard Mr. Howards say into his cell phone, "I'm going to ask him how many kids he's killed today." Aplt. App. at 532. He admitted the comment "disturbed" him. *Id.* He believed it was not "healthy" and was "[not] quite right" for someone to make such a comment to the Vice President. *Id.* Similarly, Agent Reichle was told by Agent Doyle about Mr. Howards' cell phone conversation. *Id.* at 371. Mr. Howards testified that when he told Agent Reichle "about the way [he] felt about the war in Iraq, Mr. Reichle became visibly angry . . . ." *Id.* at 500. Agent Reichle also admitted he considered this cell phone conversation when deciding to arrest Mr. Howards. *Id.* at 280. Agents Doyle and Reichle do not dispute the district court's determination that "there is a question of fact on this element [of retaliation] . . . . [because] there are conflicting accounts regarding which defendant knew what about plaintiff's cell phone conversation, when defendants knew it, and whether the conversation should be used to support probable cause." Order at 75.

    b. The presence of probable cause is not fatal to Mr. Howards'

First Amendment retaliation claim.

Instead, Agents Reichle and Doyle rely on the Supreme Court's decision in *Hartman v. Moore*, 547 U.S. 250 (2006), to contend they are entitled to qualified immunity on the First Amendment claim because "in a case such as this, an absence of probable cause for the arrest 'must be pleaded and proven' as an element of the plaintiff's case." Reichle/Doyle Br. at 14. They assert that "[i]f an officer had probable cause to arrest a plaintiff for *any* crime, it is irrelevant that a plaintiff may have engaged in protected speech prior to or during the arrest." *Id.* at 15 (citing *Redd v. City of Enterprise*, 140 F.3d 1379 (11th Cir. 1998) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978))); *cf. Hartman*, 547 U.S. at 259-60 (holding that to prevail on a *retaliatory prosecution* claim, a plaintiff must plead and prove the absence of probable cause).[9] The Agents' reliance on *Hartman* is misplaced.[10]

---

[9] In a footnote in their reply brief on appeal, Agents Reichle and Doyle contend Mr. Howards waived any response to this argument by failing to address it in the district court. *See* Reichle/Doyle Reply Br. at 10 n.3. But they themselves did not raise *Hartman* there until their reply brief. Their delay in raising *Hartman* was "manifestly unfair" to Mr. Howards "who, under [court] rules, ha[d] no opportunity for a written response" and, moreover, worked an unfairness to the district court itself, which did not have the benefit of a written response from Mr. Howards in regard to the Agents' "late-blooming argument". *See Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007) (quoting *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir.1994)) (internal quotation marks and ellipses omitted). Therefore, we address the applicability of *Hartman* as presented to us by both parties on appeal.

[10] The Agents' citations to *Zurcher v. Stanford Daily*, 436 U.S. 547, 565

(continued...)

-25-

Prior to *Hartman*, a plaintiff bringing a First Amendment retaliation claim

in this circuit was not required to show that the defendants lacked probable cause

for their actions. *See, e.g.*, *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir.

1990) (retaliatory arrest); *Poole v. Cnty. of Otero*, 271 F.3d 955 (10th Cir. 2001)

(retaliatory prosecution), *abrogated by Hartman*, 547 U.S. 250. We recognized in

the context of an arrest that "[a]n act taken in retaliation for the exercise of a

constitutionally protected right is actionable under § 1983 even if the act, when

taken for a different reason, would have been proper." *DeLoach*, 922 F.2d at 620

(internal quotation marks omitted); *see also Gehl Group v. Koby*, 63 F.3d 1528,

1534 (10th Cir. 1995) ("[G]overnment actors cannot intentionally suppress

constitutionally protected expression because of its content and avoid First

Amendment scrutiny simply by claiming that they were acting pursuant to an

---

[10](...continued)
(1978), for the proposition that "complying with the Fourth Amendment for an arrest can overcome any issues that arise with the First Amendment," *see* Reichle/Doyle Br. at 14, similarly miss the mark. *Zurcher* involved a search pursuant to a *warrant*. "The Fourth Amendment demonstrates a strong preference for searches conducted pursuant to a warrant, and the police are more likely to use the warrant process if the scrutiny applied to a magistrate's probable-cause determination to issue a warrant is less than that for warrantless searches." *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (citation and internal quotation marks omitted). As such, searches and seizures pursuant to a warrant are given deference by reviewing courts, whereas we review the constitutionality of *warrantless* searches and seizures de novo. *Id.* at 698-99. Given the substantive differences between the search of a newsroom pursuant to a warrant at issue in *Zurcher* and the warrantless arrest in a public space at issue here, we find *Zurcher* inapposite.

-26-

otherwise valid criminal law."), *abrogated on other grounds by Crawford-El v. Britton*, 523 U.S. 574 (1998).

This approach is consistent with the Supreme Court's general approach to retaliation claims under *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), which requires a plaintiff to show that the defendant's conduct was substantially motivated by the plaintiff's exercise of his or her First Amendment rights, but then shifts the burden to the defendant to prove that the same decision would have been reached "even in the absence of the protected conduct." *Id.* at 287. Nonetheless, other circuits were split on their approaches prior to *Hartman*. Some circuits, like ours, permitted plaintiffs to successfully bring retaliatory arrest and prosecution claims, despite the presence of probable cause for the arrest. *See, e.g.*, *Greene v. Barber*, 310 F.3d 889, 895 (6th Cir. 2002); *Haynesworth v. Miller*, 820 F.2d 1245, 1256-57 (D.C. Cir. 1987). Other circuits required plaintiffs to show an absence of probable cause. *See, e.g.*, *Keenan v. Tejeda*, 290 F.3d 252, 261-62 (5th Cir. 2002); *Smithson v. Aldrich*, 235 F.3d 1058, 1063 (8th Cir. 2000); *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 794-96 (3d Cir. 2000); *Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995).

*Hartman* resolved the split with regard to retaliatory prosecution cases. There, the Court addressed a plaintiff's claim for malicious prosecution based on an allegation that Postal Service inspectors and a prosecutor "engineered his

criminal prosecution in retaliation for [his] criticism of the Postal Service," in violation of his First Amendment rights. *Hartman*, 547 U.S. at 254.[11] In holding that the absence of probable cause is a necessary element of a retaliatory prosecution case, the Court was careful to distinguish between the "complex" causation relationship inherent in a retaliatory prosecution versus that of "ordinary retaliation claims, where the government agent allegedly harboring the animus is also the individual allegedly taking the adverse action." *Id.* at 259.

The Court explained:

> When the claimed retaliation for protected conduct is a criminal charge, however, a constitutional tort action will differ from this standard case in two ways. . . . What is different about a prosecution case, . . . is that there will always be a distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation, namely evidence showing whether there was or was not probable cause to bring the criminal charge. . . . The second respect in which a retaliatory-prosecution case is different also goes to . . . causation . . . ; the difference is that the requisite causation between the defendant's retaliatory animus and the plaintiff's injury is usually more complex than it is in other retaliation cases, and the need to show this more complex connection supports a requirement that no probable cause be alleged and proven.

*Id.* at 260-61. The complexity inheres because the "the causal connection required is not merely between the retaliatory animus of one person [there, the postal inspector] and that person's own injurious action, but between the retaliatory animus of one person and the action of another [the prosecutor]." *Id.*

_____

[11] The district court dismissed the claim against the prosecutor based on absolute prosecutorial immunity. *Hartman*, 547 U.S. at 254-55.

-28-

at 262.  Indeed, as the Court made clear, "[i]t is . . . the need to prove a chain of causation from animus to injury, with details specific to retaliatory-prosecution cases, that provides the strongest justification for the no-probable-cause requirement espoused by the inspectors."  *Id.* at 259.

Before concluding, the Court noted one additional difference in the retaliatory prosecution context: the "added legal obstacle in the longstanding presumption of regularity accorded to prosecutorial decisionmaking."  *Id.* at 263.  "[T]his presumption that a prosecutor has legitimate grounds for the action he takes is one we do not lightly discard . . . ."  *Id.*

In the wake of *Hartman*, our sister circuits continue to be split over whether *Hartman* applies to retaliatory arrests, that is, whether a plaintiff in that retaliation context must show that the defendants lacked probable cause for the arrest.  *See Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1231 & n.31 (9th Cir. 2006) (recognizing split among circuits).  *Compare McCabe v. Parker*, 608 F.3d 1068, 1075 (8th Cir. 2010), *Phillips v. Irvin*, 222 F. App'x 928, 929 (11th Cir. 2007), *and Barnes v. Wright*, 449 F.3d 709, 720 (6th Cir. 2006) (requiring plaintiffs to show lack of probable cause for arrest), *with Skoog*, 469 F.3d at 1231 (allowing plaintiffs to bring First Amendment retaliation claims even when probable cause existed for arrest).[12]

---

[12] Although *Skoog* held that in an "ordinary" retaliation case, the plaintiff
(continued...)

We decline to extend *Hartman*'s "no-probable-cause" requirement to this retaliatory arrest case. Unlike the plaintiff in *Hartman*, Mr. Howards does not attack prosecutorial discretion based on the bad motive of a third person. Instead, he contends Agents Reichle and Doyle arrested him with their own retaliatory motives, because of the exercise of his First Amendment rights. Such is the quintessential "ordinary retaliation claim" as outlined in *Hartman* – a claim in which the agent allegedly harboring the unconstitutional animus is the same individual who carries out the adverse action. *Hartman*, 547 U.S. at 259-60. And unlike prosecutors, Secret Service Agents enjoy no presumption of regularity regarding their decisionmaking. As a result, this factor counts against extending *Hartman* to the circumstances here.

In light of the care the Supreme Court took to distinguish between complex and ordinary retaliation claims, we are not persuaded *Hartman* applies to the circumstances here.[13] *See* John Koerner, Note, *Between* Healthy *and* Hartman*:

---

[12](...continued)
need not plead the absence of probable cause in order to state a claim, it also determined that the constitutional violation was not clearly established when Mr. Skoog's arrest occurred. 469 F.3d at 1235. *Skoog* explained that even prior to *Hartman* it was "an open question" in the Ninth Circuit whether "a plaintiff must plead the absence of probable cause in order to . . . state a claim for retaliation . . . ." *Id.* at 1232; *see also id.* at 1232 n.30. Unlike the Ninth Circuit, our circuit has prior binding precedent that a plaintiff need not plead the absence of probable cause to bring a retaliatory arrest claim. *See DeLoach*, 922 F.2d at 620.

[13] We have applied *Hartman* in another context, but that was a situation involving complex causation, not an ordinary retaliation claim like the one in this
(continued...)

*Probable Cause in Retaliatory Arrest Cases*, 109 Colum. L. Rev. 755, 771 (2009)

("[T]he Court did not signal that it was rejecting [the *Mt. Healthy*] standard in

general. Instead, the Court stressed three factors that supported a heightened

pleading standard in retaliatory prosecution cases: complex causation, evidentiary

concerns, and the presumption of prosecutorial regularity."). The alternative

approach, extending the "no-probable-cause" requirement to this ordinary

retaliatory arrest case and dismissing Mr. Howards' suit, would result in the

Court's limited exception devouring the rule. Because we hold *Hartman* did not

disturb our earlier precedent on ordinary retaliation cases, when Mr. Howards was

arrested it was clearly established that an arrest made in retaliation of an

individual's First Amendment rights is unlawful, even if the arrest is supported by

probable cause.[14] Accordingly, our prior precedent permits Mr. Howards to

---

[13](...continued)
case. In *McBeth v. Himes*, 598 F.3d 708, 719 (10th Cir. 2010), we applied *Hartman* to require proof of the absence of probable cause in a claim alleging that defendants induced the Department of Human Services to suspend plaintiff's daycare license. This application of *Hartman* was justified because that claim "present[ed] the same difficulties in tracing the chain of causation as *Hartman* did." *Id.* We expressly "[did] not hold that the *Hartman* rule is applicable to 'ordinary' retaliation claims." *Id.* at 720.

[14] Notably, no party asserts on appeal that the law on retaliatory arrests was not "clearly established" in this circuit either before or after *Hartman*. Nevertheless, the dissenting opinion points to the split among the circuits to argue the law on retaliatory arrests was not "clearly established" after *Hartman*. In qualified immunity cases, we may look to other courts when there is no Supreme Court or Tenth Circuit precedent on point to determine if a right is "clearly established." *See, e.g.*, *York v. City of Las Cruces*, 523 F.3d 1205, 1211-12 (10th

(continued...)

proceed with his First Amendment retaliation claim notwithstanding probable

cause existed for his arrest.[15]  *See DeLoach*, 922 F.2d at 620.

---

[14](...continued)
Cir. 2008).  Although a conflict among the circuits "is relevant" to our determination of whether a right is clearly established, it is "not controlling." *Garcia by Garcia v. Miera*, 817 F.2d 650, 658 (10th Cir. 1987).  "[T]he fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear if we have been clear." *Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S. Ct.  2633, 2644 (2009).  Prior to *Hartman*, the law on retaliatory arrests was clear in the Tenth Circuit.  *See DeLoach*, 922 F.2d at 620; *see also Greene v. Barber*, 310 F.3d 889, 895 (6th Cir. 2002) (relying on *DeLoach* and explaining "the existence of probable cause is not determinative of the constitutional question if . . . the plaintiff was arrested in retaliation for his having engaged in constitutionally protected speech"). *Hartman* did nothing to disturb this law.  The fact that some of our sister circuits disagree with us on this issue does not bind us, nor does it force us to find the law was no longer clearly established in this circuit.  *See Garcia*, 817 F.2d at 658.

[15] It is well established that an act which is lawful under the Fourth Amendment may still violate other provisions of the Constitution.  For example, in *Whren v. United States*, 517 U.S. 806, 809 (1996), the Court considered whether a traffic stop that was supported by probable cause could violate the Fourth Amendment when the reason for the stop was pretextual.  The two black male defendants were arrested for possessing illegal drugs after their car was stopped by vice officers in a "high drug area." *Id.* at 808.  The defendants conceded the police had probable cause to believe that they had violated local traffic laws, but argued the traffic stop nonetheless should be held unreasonable under the Fourth Amendment, because the stop was pretextual and no reasonable officer would have stopped them for those traffic violations. *Id.* at 810.  The Court held "[s]ubjective intentions [of police] play no role in ordinary, probable-cause Fourth Amendment analysis," therefore the traffic stop did not violate the Fourth Amendment.  The Court nevertheless pointed out that "the Constitution prohibits selective enforcement of the law based on considerations such as race." *Id.* at 813.  As a result, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Id.*  A reasonable search and seizure is thus not inoculated against all constitutional scrutiny.  Significantly, *Hartman* did not overrule *Whren*, nor did it undermine this important principle.

Based on the record here, and in the absence of any argument from Agents Reichle and Doyle that Mr. Howards failed to present evidence to establish a First Amendment violation, *see Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009), we conclude the district court correctly denied these Agents' motion for qualified immunity on Mr. Howards' First Amendment claim for retaliatory arrest.

### 2. *Agents Daniels and McLaughlin*

Significantly, Mr. Howards has not identified anything in the record that might support a retaliatory motive on the part of Agents Daniels or McLaughlin. To survive summary judgment, Mr. Howards must show that defendants violated his constitutional rights. Given the nature of his First Amendment retaliation claim, he must offer evidence indicating a retaliatory motive on the part of these defendants in response to the exercise of his First Amendment rights. *See Nielander*, 582 F.3d at 1165.

Mr. Howards has neither offered evidence nor articulated facts showing that Agents Daniels or McLaughlin's conduct was in any way influenced by a retaliatory motive. Mr. Howards argues that because both Agents "Daniels and McLaughlin included [the cell phone] statement in their incident reports" but excluded other facts, there is "circumstantial evidence that Agents Daniels and McLaughlin were not motivated to arrest Mr. Howards because of his conduct, but were, in fact, motivated to arrest him because of the content of his speech." Aple.

Br. at 47. In the context of this case, this evidence alone is inadequate to satisfy the third element of a First Amendment claim.

Mr. Howards has provided no evidence that Agents Daniels and McLaughlin did anything but follow the directions of fellow Secret Service Agents. They began monitoring Mr. Howards' movements when asked to by Agent Doyle. Agent McLaughlin indicated he believed it was "within [Mr. Howards'] bounds" to make a critical statement to the Vice President. Aplt. App. at 425. Although Agent Doyle told them about Mr. Howards' cell phone call, Agents Daniels and McLaughlin were unaware of what Mr. Howards actually said to the Vice President. Similarly, Mr. Howards offered no evidence that either Agent Daniels or Agent McLaughlin participated in the decision to arrest him. They had no contact with Mr. Howards until after Agent Reichle ordered the arrest. There is no suggestion in the record that Agents Daniels and McLaughlin did anything but assist their fellow agents. Without such evidence, Mr. Howards has not shown that Agents Daniels and McLaughlin violated his constitutional rights, as required in qualified immunity cases. *See, e.g.*, *Pearson*, 129 S. Ct. at 815-16; *Swanson*, 577 F.3d at 1199.

Significantly, Agents Daniels and McLaughlin were entitled to rely on Agent Reichle's determination that there was probable cause to arrest Mr. Howards. Just as with police work, a Secret Service Agent's role requires reliance "on the observations, statements, and conclusions" of fellow agents. *See Baptiste*

*v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998). "When one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists." *Stearns v. Clarkson*, 615 F.3d 1278, 1286 (10th Cir. 2000). "Police officers are entitled to rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention or probable cause to arrest." *Oliver v. Woods*, 209 F.3d 1179, 1190 (10th Cir. 2000). "[A] police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable." *Baptiste*, 147 F.3d at 1260 (internal quotation marks omitted). As a result, absent evidence that Agents Daniels and McLaughlin were motivated to arrest Mr. Howards because of his speech, they are entitled to qualified immunity for assisting in the arrest, so long as their reliance on Agent Reichle was objectively reasonable.

Under the circumstances, it was objectively reasonable for Agents Daniels and McLaughlin to rely on Agent Reichle's probable cause determination. The two agents knew they had access to incomplete information regarding Mr. Howards' conduct. Because they were operating in undercover counter-surveillance roles, they did not carry radios and therefore did not have any information about Mr. Howards that might have been transmitted by radio. Agent

Reichle, on the other hand, carried a radio and had interviewed Mr. Howards.

Although Mr. Howards emphasizes that Agents Daniels and McLaughlin both believed, based on what they had seen, there was not probable cause to arrest Mr. Howard for his touch of the Vice President, this is not dispositive. Agents Daniels and McLaughlin's personal knowledge is irrelevant unless it in some way suggests that their reliance on Agent Reichle's probable cause determination was unreasonable. *See Stearns*, 615 F.3d at 1286. Given the compartmentalized roles of the agents, and the potential information to which Agents Daniels and McLaughlin lacked access, their own observations did not undermine the objective reasonableness of their reliance on Agent Reichle. Accordingly, the district court erred in denying Agents Daniels and McLaughlin's motion for qualified immunity and for judgment as a matter of law on Mr. Howards' First Amendment claim.

## IV.

For the foregoing reasons, we **REVERSE** the district court's denial of qualified immunity to all defendants on Mr. Howards' Fourth Amendment claim; we **REVERSE** the district court's denial of qualified immunity to Agents Daniels and McLaughlin on Mr. Howards' First Amendment claim; and we **AFFIRM** the district court's denial of qualified immunity to Agents Reichle and Doyle on Mr. Howards' First Amendment claim and **REMAND** for further proceedings consistent with this opinion.

No. 09-1201, 09-1202, <u>Howards v. McLaughlin</u>

**KELLY**, Circuit Judge, concurring in part and dissenting in part.


In my view, all of the agents should receive qualified immunity. Thus, I concur insofar as Agents Daniels and McLaughlin receive it, and dissent as to the denial of qualified immunity to Agents Reichle and Doyle.

The Fourth Amendment issue in this case is plainly controlled by <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004), holding that as long as an officer is aware of facts suggesting probable cause, the offense that furnishes the basis for probable cause need not be related to what is charged. In the qualified immunity context, all that is required is arguable probable cause, and in this case agents had arguable probable cause to believe that Mr. Howards made a false statement. <u>See</u> <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1121 (10th Cir. 2007) (en banc) (arguable probable cause).

There is a strong argument that <u>Hartman v. Moore</u>, 547 U.S. 250 (April 26, 2006), applies not only to retaliatory prosecutions, but also to retaliatory arrests. The prosecutor will generally receive absolute immunity for decisions to prosecute, while the agents and investigators will claim qualified immunity for steps leading to prosecution (investigation and arrest) and prosecution. Probable cause evidence will be readily available and relevant in most retaliatory arrest cases; the fact that causation may not be as complex should not preclude consideration of this as an element. Several cases hold or imply that <u>Hartman</u>

applies to arrest as well as prosecution.  See McCabe v. Parker, 608 F.3d 1068, 1079 (8th Cir. 2010); Beck v. City of Upland, 527 F.3d 853, 863-64 (9th Cir. 2008) (suggesting that Hartman applies to a retaliatory arrest or prosecution claim); Leonard v. Robinson, 477 F.3d 347, 355-56 (6th Cir. 2007); Barnes v. Wright, 449 F.3d 709, 720 (6th Cir. 2006).  The court adopts a minority view based upon the rationale of Skoog v. City of Clackamas, 469 F.3d 1221, 1233-35 (9th Cir. 2006).

Given a qualified immunity defense, Plaintiff had the burden to prove not only a constitutional violation but also clearly established law.  Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 815-816 (2009).  In DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990), this court held that a claim for retaliatory arrest and prosecution (leading to a suspect being bound over for trial), was actionable, even if another reason would have supported the action.

On June 16, 2006, when the arrest in this case occurred, the law simply was not clearly established (nor is it now) that Hartman only applied to retaliatory prosecutions and not retaliatory arrests.  The Tenth Circuit has been willing to apply Hartman in other contexts, albeit where there are multiple decisionmakers. McBeth v. Himes, 598 F.3d 708, 718-20 (10th Cir. 2010).  Given that the officers are deemed to have probable cause, no objectively reasonable officer on June 16, 2006 would be on notice that probable cause was insufficient to overcome claims of First Amendment retaliation.  There are two reasons for this.  First, DeLoach is

-2-

a retaliatory arrest and prosecution (not solely a retaliatory arrest) case—the significance of this may not have been apparent earlier, but it certainly is after Hartman.  Second, in Hartman the Supreme Court rejected the Tenth Circuit's approach to retaliatory prosecution cases, 547 U.S. at 256, and the court today acknowledges that "our sister circuits continue to be split over whether Hartman applies to retaliatory arrests."  Ct. Op. at 29.

If anything, the weight of DeLoach when applied solely to a retaliatory arrest case was far from clear after Hartman.  The court reminds us that a conflict among the circuits is merely relevant to whether a right is clearly established, not controlling, and also relies upon the Supreme Court's statement that "the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear if **we** have been clear."  Safford Unified Sch. Dist. No. 1 v. Redding, 129 S. Ct. 2633, 2644 (2009) (emphasis added).  Of course, the "we" pertains to the Supreme Court.  This court's conclusion after Hartman—that Hartman did nothing to disturb this circuit's law on retaliatory arrests—is by no means a preordained conclusion as evidenced by this court's acknowledgment that courts are split about whether it applies to retaliatory arrests, and the analysis rejecting Hartman in this context.  The law the court announces was hardly apparent and would not put officials on fair notice that such conduct was unlawful.  See Hope v. Pelzer, 536 U.S. 730, 739 (2002).  This is particularly true given how solicitous the court has been when it comes to

-3-

protecting the Vice President.  <u>See</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 208-09 (2001).